## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**K.C. PHARMACEUTICALS, INC.,**

**Plaintiff,**

**v.**

**JAMES F. STRIETER,**

**Defendant.**                                    **No. 05-CV-0255-DRH**

### MEMORANDUM and ORDER

**HERNDON, District Judge:**

### I.  Introduction and Background

Now before the Court are cross motions for summary judgment (Docs. 17 & 21).  K.C. Pharmaceuticals, Inc., moves the Court to pierce the corporate veil as to Strieter Clinical Testing Laboratories, Inc., to enforce its judgment against Dr. James Strieter individually on the ground that Strieter Clinical Testing Laboratories, Inc., was the alter ego Dr. Strieter.  Strieter opposes the motion (Doc. 20).  Strieter also filed a motion for summary judgment arguing that he is entitled to summary judgment because the evidence fails to support the elements of K.C. Pharmaceuticals, Inc.'s cause of action.  Based on the record, the applicable law, oral arguments held March 20, 2006  and the following, the Court grants K.C. Pharmaceutical's motion for summary judgment and denies Dr. Strieter's motion for summary judgment. The Court denied Plaintiffs Motion to Strike Defendants Affidavit (Doc. 23) during the oral argument on March 20, 2006.

On April 11, 2005, K.C. Pharmaceuticals, Inc. ("K.C.") filed suit against James F. Strieter ("Strieter") based on diversity, **28 U.S.C. § 1332**, to pierce the corporate veil as to Strieter Clinical Testing Laboratories, Inc. ("Clinical") to enforce its judgment against Strieter personally on the ground that Clinical was the alter ego of Strieter. (Doc. 1). The complaint alleges that Strieter is the Sole Officer, Shareholder, President and Registered Agent of Clinical. (Doc. 1, ¶ 5). The complaint also alleges that in 2001, Clinical, along with another company, Eurexpan, Ltd. f/k/a Eurexpan Labo, S.A. and Eurexpan (collectively "Eurexpan") filed suit against K.C. in the Madison County, Illinois Circuit Court. (Doc. 1, ¶ 6). The lawsuit contained third party beneficiary and tortious interference claims. (Doc. 1, ¶ 6). On July, 8, 2004, Circuit Court Judge Kardis dismissed with prejudice (a result of discovery violations) all of the claims against K.C. and awarded K.C. judgment jointly and severally for its attorneys' fees and costs in the amount of $81,948.11. (Doc. 1, ¶ 7). The complaint further alleges that Clinical is the alter ego of Strieter; that it failed to observe cooperate formalities and there is an absence of business records, it was inadequately capitalized; it has no assets and paid little or no dividends; and that there are no corporate officers or directors other than Strieter. (Doc. 1, ¶ ¶ 16, 17, 18 and 19).

On June 22, 2005, K.C. filed its motion for summary judgment (Doc. 17). Strieter filed his opposition on July 25, 2005 (Doc. 20). Shortly thereafter,

Strieter filed his motion for summary judgment (Doc. 21).[1]   K.C. responded to

Strieter's motion for summary judgment on August 31, 2005 (Doc. 25).  Both parties

filed reply briefs to the respective motions (Docs. 22 & 26).  The Court now turns to

address these motions.

## II.  Facts

Clinical was incorporated in the State of Illinois in 1984.  Strieter, he

admitted, is the sole shareholder and officer of Clinical.  Clinical is, described by

Strieter, as "an intellectual corporation."  Its primary function is to conduct clinical

studies on contact lenses and solutions required by the U.S. Food and Drug

Administration for marketing approvals.

On July 8, 1996, the parties seem to agree,  Eurexpan and K.C. entered

into two agreements known as the Supply and Licensing Agreement ("Supply

Agreement") and Manufacturing Agreement.   Under the terms of the Supply

Agreement, Eurexpan granted a K.C. a non-exclusive license to manufacture a certain

contact lens solution and to use certain technical information supplied by Eurexpan

to manufacture and sell solution to third parties.  In return, K.C. agreed to purchase

from Eurexpan a disinfectant known as Solsept for use in manufacturing the lens

solution.   Bactofungus was an ingredient in Solsept.   The Supply Agreement

specifically states that "assays of Bactofungus will be performed by Dr. James

Strieter and Strieter Laboratories, Inc. ("Strieter") and paid by Eurexpan."   It also

---

[1]The Court notes that Strieter's motion for summary judgment is almost verbatim to his
opposition to K.C.'s summary judgment

states that K.C. is obligated to supply Product to Strieter.

On November 21, 1996, Eurexpan and Clinical entered into two agreements, the Agency Agreement and the Distribution Agreement. Under the terms of the Agency Agreement, Eurexpan appointed "Strieter Clinical Testing Laboratories, Inc. d/b/a Eye Care Products" to be its "agent for performing analyses of Product manufactured by KC Pharmaceutical, as provided for in clause 9.05 of the Supply and Licensing Agreement." Under the terms of the Distribution Agreement, "Strieter Clinical Testing Laboratories, Inc., d/b/a Eye Care Products" was appointed Eurexpan's "non-exclusive agent for warehousing and distributing Eurexpan's brand name products at prices and conditions acceptable to Eurexpan." Clinical's compensation under the Agency and Distribution Agreements was based on the amount of sales by Eurexpan to K.C. under the Supply and Licensing Agreement between Eurexpan and K.C.

In 2001, Eurexpan and Clinical filed suit against K.C. in the Madison County, Illinois Circuit Court, Case No. 2001-L-001068 (the "Madison County Case"). Clinical asserted third party beneficiary and tortious interference claims against K.C. based on K.C.'s breach of its agreement with Eurexpan. (Doc. 17, Exhibit 1, Count III, ¶ ¶ 43-45 and Count IV, ¶ ¶ 43-46). Clinical also alleged that K.C. knew that "the assays of Bactofungus would be performed by Dr. James Strieter, and Strieter Laboratories, Inc." (Doc. 17, Exhibit 1, Counts II and IV, ¶ 42).

On July 8, 2004, Madison County Circuit Judge Kardis dismissed with prejudice Eurexpan and Clinical's claims against K.C. for discovery violations and

awarded "attorney's fees in the amount of $78,396.30 and costs in the amount of $3,551.81 against the plaintiffs … jointly and severally."   (Doc. 17, Exhibit 8). Thereafter, K.C. filed a Citation to Discover Assets against Clinical.  The hearing was held on December 16, 2004 and Strieter appeared on behalf of Clinical without counsel.  (Doc. 17, Exhibit 6).

At the Citation hearing, Strieter testified to the following.  He is the sole officer, sole shareholder, president and registered agent of Clinical. (Doc. 17, Exhibit 6, ps. 2-5).  The only income tax return filed for Clinical was in 2001 because he "failed to file them.  All income prior to that time went to Strieter Laboratories which was the group that did all the testing by their personnel and with their equipment, so there was no income to Strieter Clinical Testing Laboratories prior to 2001." (Doc. 17, Exhibit 6, p.4).

Strieter Laboratories did all of the testing that was required under the agreement between K.C. and Eurexpan.  All payments for the testing were received from Eurexpan and paid directly to Strieter Laboratories for work done by Strieter Laboratories.  Clinical did nothing and received no funds even though Clinical was the entity that signed the contracts with Eurexpan. (Doc. 17, Exhibit 6, ps. 16, 19-21).   Clinical did not earn the money.  Strieter Laboratories earned the money. Strieter Laboratories also sold solutions it purchased from K.C. (Doc. 17, Exhibit 6, p. 27).

Strieter was the president of Strieter Laboratories and its largest shareholder.  He owned approximately 40-50% of the shares of Strieter Laboratories.

(Doc. 17, Exhibit 6, ps. 4, 16-17).

Clinical was an intellectual corporation that existed "all in the brain" of Strieter.  (Doc. 17, Exhibit 6, ps. 11-12).  Clinical never owned any real estate, insurance, equipment, tangible property or any investments.  It was a one man corporation.  (Doc. 17, Exhibit 6, ps. 9-11).  It "never had any actual income."  Its only assets were $1,500 which were disbursed in 2001.  (Doc. 17, Exhibit 6, ps. , 20-21).  The income received from Eurexpan was paid directly to Strieter Laboratories. (Doc. 17, Exhibit 6, ps. 20-22).  The Clinical's bank account was closed in 2002.  Its only purpose was to enter into contracts with other corporate entities. (Doc. 17, Exhibit 7, ps. 48-49).  Clinical and Strieter Laboratories had no written agreements or contracts between them.  (Doc. 17, Exhibit 6, p. 27).  Strieter generated all of the Action of Shareholders by Unanimous Consent documents on his own computer. He does not remember when he signed these documents and these documents may have been generated after the Madison County lawsuit was filed. (Doc. 17, Exhibit 7, ps. 32-33).

In his affidavit in opposition to K.C.'s motion for summary judgment and in support of his motion for summary judgment, Strieter states that Clinical currently does have a bank account, that he filed tax returns for the years 2000-2002 and that Clinical performed studies on contact lens and performed certain studies for Eurexpan.  (Doc. 20, Exhibit 1).

### III.  **Motion for Summary Judgment Standard**

Summary judgment is proper where the pleadings and affidavits, if any,

"show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." **FED. R. CIV. P. 56(c);** *Oats v. Discovery Zone*, **116 F.3d 1161, 1165 (7th Cir. 1997)(citing** *Celotex Corp. v. Catrett*, **477 U.S. 317, 322 (1986))**.  The movant bears the burden of establishing the absence of fact issues and entitlement to judgment as a matter of law. *Santaella v. Metro. Life Ins. Co.*, **123 F.3d 456, 461 (7th Cir. 1997)(citing** *Celotex*, **477 U.S. at 323)**.  The Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *Regensburger v. China Adoption Consultants, Ltd.*, **138 F.3d 1201, 1205 (7th Cir. 1998)(citing** *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 255 (1986))**.

In response to a motion for summary judgment, the non-movant may not simply rest upon the allegations in his pleadings.  Rather, the non-moving party must show through specific evidence that an issue of fact remains on matters for which he bears the burden of proof at trial. *Walker v. Shansky*, **28 F.3d 666, 670-71 (7th Cir. 1994),** *aff'd*, **51 F.3d 276 (citing** *Celotex*, **477 U.S. at 324)**.  In reviewing a summary judgment motion, the court does not determine the truth of asserted matters, but rather decides whether there is a genuine factual issue for trial. *Dykema v. Skoumal*, **261 F.3d 701, 704 (7th Cir. 2001)(citing** *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 249)**.  The "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to show a genuine issue of material fact." *Weeks v. Samsung Heavy Indus. Co., Ltd.*, **126 F.3d 926,**

933 (7th Cir. 1997)(citing *Anderson*, 477 U.S. at 252).

No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).  Accord *Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996), cert. denied, 519 U.S. 1055 (1997); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994). "[P]laintiff's own uncorroborated testimony is insufficient to defeat a motion for summary judgment." *Weeks*, 126 F.3d at 939.  Further, Plaintiff's own subjective belief does not create a genuine issue of material fact.  *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 401 (7th Cir. 1997).  "If the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed." *Id.* (quoting *Mills v. First Fed. Sav. & Loan Assoc.*, 83 F.3d 833, 841-42 (7th Cir. 1996)).

By filing cross-motions for summary judgment, parties do not waive their right to a trial on the merits. *Market St. Assocs. Ltd. P'ship v. Frey*, 941 F.2d 588, 590 (7th Cir.1991).  Each party is merely asking a court to grant it judgment without a trial but, if the judge disagrees, each wants a trial. *Miller v. LeSea Broad., Inc.,* 87 F.3d 224, 230 (7th Cir.1996).  *But see Cook Inc. v. Boston Scientific Corp.,* 333 F.3d 737, 738 (7th Cir.2003) (finding an implied

**waiver to trial where the parties wanted a trial limited to the summary judgment**

**record**).  Each movant individually must fulfill the requirements necessary to obtain

summary judgment under **Federal Rule of Civil Procedure 56**.  A court is not

required to grant summary judgment as a matter of law for either side when faced

with cross-motions for summary judgment.  ***See Frey,* 941 F.2d at 590**

**(distinguishing cross-motions for summary judgment from a trial on the papers,**

**where a judge must enter judgment for one party**).  Rather, the court is to evaluate

each motion on its merits, resolving factual uncertainties and drawing all reasonable

inferences against the movant.  ***Brownlee v. City of Chicago,* 983 F.Supp. 776,**

**779 (N.D.Ill. 1997)**.

## IV.  <u>Analysis</u>[2]

A court may find corporate officers personally liable for corporate

obligations, through a remedy known as piercing the corporate veil.  ***State of***

***Illinois v. V&M Industries, Inc.*, 700 N.E.2d 746, 750 (Ill. App. 1998)(citations**

**omitted)**.  Under the law of Illinois, a party seeking to disregard the corporate entity

because the targeted corporation is merely the alter ego of the dominating personality

must show that (1) there is such a unity of interest and ownership that the separate

personalities of the corporation and the individual no longer exist; and (2)

---

[2]Because neither party raised the choice of law issue, the Court will apply Illinois law. "[t]he operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits. . . .  Courts do not worry about conflict of laws unless the parties disagree on which state's law applies." ***Wood v. Mid-Valley, Inc.*, 942 F.2d 425, 426-27 (7th Cir. 1991)**.

circumstances are such that adhering to the fiction of a separate corporate existence would promote injustice or inequity." *Melko v. Dionisio,* **580 N.E.2d 586, 594 (1991)**.

A corporate entity will be disregarded if it would otherwise present an obstacle to the protection of private rights or if the corporation is an alter ego or business conduit of the governing or dominant personality. *V & M Indus.,* **700 N.E.2d at 751**. "Some element of unfairness, something akin to fraud or deception, or the existence of compelling public interest must be present in order to disregard or pierce the corporate veil." *Id.* **(citing *Berlinger's Inc. v. Beef's Finest, Inc.,* 372 N.E.2d 1043, 1048 (Ill. App. 1978)**). Whether to pierce the corporate veil is a matter of the trial court's discretion. *See Crum v. Krol,* **425 N.E.2d 1081, 1089 (Ill. App. 1981) (holding that "the trial court did not abuse its discretion in allowing Crum and Thomas Crum & Associates to be treated as a single entity"**). Under Illinois law, piercing of the corporate veil on an alter ego theory is available only where failing to provide such relief would promote injustice or inequity.

"In determining whether to disregard a corporate entity, a court should consider the following variables, with no single factor being determinative: (1) inadequate capitalization, (2) the failure to issue stock, (3) the failure to observe corporate formalities, (4) the payment of dividends, (5) the insolvency of the debtor corporation at the time, (6) the nonfunctioning of other corporate officers or directors, (7) the absence of corporate records, and (8) whether the corporation is

a mere facade for the operation of dominant stockholders.  *Ted Harrison Oil Co.,* 247 Ill.App.3d at 795, 187 Ill.Dec. 441, 617 N.E.2d at 902." ***V & M Industries, Inc.* 700 N.E.2d at 751**.

Strieter has admitted and K.C. has demonstrated the elements necessary to pierce the corporate veil as to Clinical to enforce its judgment against Strieter individually on the ground that Clinical  was the alter ego of Strieter.  The Court finds that there was such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist.  The only evidence on the record is that unity of interest is all that ever existed.  Defendant cannot offer any evidence to the contrary, as will be shown with regard to every facet of this issue regarded by the courts.

First, while Strieter asserts to the contrary, it is clear that Clinical was undercapitalized.  Strieter asserts that Clinical "never had any actual income" and held property for a short time.  (Doc. 17, Exhibits 6 & 7, ps. 11-12, 20-22, and 48-49).  Though the record showed that he diverted the income of Clinical to Streiter Lab's.   During oral argument, counsel for Strieter argued that there was never a reason for Clinical to be capitalized.  When pressed, he replied that suggested reasons for capitalization were speculation.  Isn't the need to capitalize every corporation at it's outset and from time to time thereafter based on speculation? The speculation that capital will be needed for certain foreseen and unforeseen reasons. But isn't that speculation founded on the legal principal that adequate capitalization is essential in sound business practices?  Clinical was engaged in the business of

medical research.  If it wasn't just the alter ego of Dr. Streiter, then, it surely must

be prepared to meet the potential for liabilities of engaging it's subcontractors, of it's

mistakes, of it's creditors, including judgment creditors.

Second, there appears to be a failure to issue stock.[3]  Strieter testified

that he was the sole shareholder of Clinical and there are no stock certificates on file.

While not a heavily relied upon factor, it adds up with the other failures of Dr.

Strieter to treat this corporation as other than his alter ego.

Third, the Court finds, contrary to Strieter's assertions, that Clinical

failed to observe corporate formalities.  No corporate meetings were held and there

are very few corporate records.  The record reveals that Clinical was incorporated

and papers were filed with the Illinois Secretary of State in 1984.  The record also

reveals that on November 21, 1984, Strieter elected himself as sole director with the

title of chairman and appointed himself president, vice-president, secretary and

treasurer. Further, the only corporate records after 1984 (the year it was

incorporated) are one page documents entitled "Action of Shareholders by

Unanimous Written Consent" for each year from 1984 through 2004.  These

documents are identical in *every* way except the date.  In fact, each of these

documents contain the same typographical error.  It is clear from Strieter's

testimony at the hearing to discover assets that he did not prepare the Unanimous

Written Consent forms until after 2001.  Moreover, Strieter used Clinical

---

[3]The parties did not address this factor.

interchangeably with himself and Strieter Laboratories.   Strieter exercised ownership, direction and control over Clinical.  While articles of incorporation were filed with the Illinois Secretary of State, the record confirms that corporate formalities were overlooked.  While not precisely a corporate form, the Court finds it telling that no corporate income tax returns were filed prior to the year 2000.  A discussion of this was initiated by the Court during oral argument.  It was concluded that this it was speculative whether the corporation had income prior to that date.  However, in examining the record further, it strikes the Court, as it should have everyone during oral argument, that clearly Clinical had income prior to the year 2000 because that was the time period during which the contract with Eurexpan took place and the infamous passing of the check directly to Strieter Labs took place.  Obviously, Clinical had income and had expenses in the form of subcontractor expense.  However, instead of taking the check into the corporation and following corporate and accounting formalities, including filing a tax return, the Defendant, by his own admission, simply signed the check over to Strieter Labs.  This, the Court, submits is a clear example of Strieter treating Clinical as his alter ego and a unity of identity.

Fourth, no dividends were paid.  The only evidence to support any dividend paid by Clinical ever is Strieter's testimony that in 2001 Clinical's $1500 worth of assets probably were disbursed to him as a dividend.  (Doc. 17, Exhibit 6, p. 8).  However, Strieter's affidavit states that "$1,500 was not paid to me as a dividend, but instead remained in Clinical's account and was used by Clinical the

following year."  (Doc. 20, Exhibit 2, ¶ 19).

Fifth, it appears that Clinical was insolvent at one time and that its bank account was closed.  According to the Illinois Secretary of State's Corporation File Detail report Clinical was involuntarily dissolved on April 1, 2005.  Strieter also testified that Clinical's bank account is long closed and that it never had any actual income. (Doc. 17, Exhibit 6, ps. 8-9, 20-22).  In fact, Clinical was never adequately funded.  However, according to Strieter, Clinical was involuntarily dissolved due to an administrative oversight –  an annual report for 2004 was not filed for the year 2004.  (Doc. 20, Exhibit 2, ¶ 9).  Clinical was reinstated after it filed the necessary paperwork on July 19, 2005. (Doc. 20, Exhibit 2, ¶ 9).  Further, Strieter states that Clinical *currently* has a bank account.  (Doc. 20, Exhibit 2, ¶ 6).  The Plaintiff asserts that none of his testimony can be taken as true.   The Court believes this demonstrates that while this confusion demonstrates a credibility problem, for summary judgment purposes where issues of disputed evidence are not resolved, it is undisputed that Strieter's failed to treat the corporate entity formally and that such demonstrates his failure to prevail on the ultimate issue at bar.

Sixth, the record is clear as to the nonfunctioning of other corporate officers or directors element.  Clinical had no other corporate officers or directors. Obviously, Strieter is Clinical.

Seventh, as previously set forth, there is an absence of corporate records.  While Clinical was incorporated and Unanimous Written Consents were filed for each year (as stated earlier, the Court finds that these were generated

sometime after 2001), these and the documents to reinstate Clinical after the involuntary dissolution are the only documents on file.

Finally, the Court concludes after a complete review of the record that Clinical was a mere facade for the operation of Strieter, the only shareholder. Strieter testified that Clinical was an intellectual corporation that existed all in the brain.  He testified that Clinical never had any actual income and that the income received went directly to Strieter Laboratories.  (Doc. 17, Exhibit 6, ps. 20-22). Strieter knew that he and Strieter Laboratories performed all of the testing under the Agreements between Eurexpan and K.C. and the Agreements between Clinical and Eurexpan.   The only funds ever paid by Eurexpan were diverted to Strieter Laboratories from Clinical by Strieter.  Moreover, it was Strieter, through Clinical, who decided to sue K.C. and to perpetuate the litigation even though Clinical hadn't realized any income from K.C. because Strieter had been diverting all such income to Strieter Labs.

Further, the Court concludes that circumstances in this case are overwhelming to the point that adherence to the fiction of a separate corporate existence would promote injustice.  Specifically, Strieter cannot hide behind this corporate shell to avoid his responsibility in the bad faith pursuit of litigation. Looking at this situation from the reverse, if the judicial system was to allow litigants to utilize corporate shells there would be no holding proper persons to account for irresponsible activities in the litigation and the courts would be powerless to enforce the rules of engagement.

Page 15 of  16

## V.  Conclusion

Accordingly, the Court **GRANTS** Plaintiff's motion for summary judgment (Doc. 17) and **DENIES** Defendant's motion for summary judgment (Doc. 21).  The Court **DIRECTS** the Clerk of the Court to enter judgment in favor of Plaintiff K.C. Pharmaceuticals, Inc. and against Defendant James F. Strieter.  Lastly, the Court **DENIES** Plaintiff's motion to strike (Doc. 23).

**IT IS SO ORDERED.**

Signed this 20th day of March, 2006.

/s/          David  RHerndon
**United States District Judge**